John Cringan and William Atcheson filed their bill in the late High Court of Chancery, stating that they were copartners with George Nicolsori in a rope-walk, the site of *194 which was purchased in the year 1791, by the said Nicolson, for and on behalf of the company, of William Mayo; but the deed for the same was taken by him to himself only; that the said Nicolson, being the acting partner who managed the business, and wishing to live near the rope-walk, proposed to them to let him have a small slip of the land, viz. 2 3-4 acres, for his residence; to which they assented, and signed an agreement to that effect, as they chose him to reside near the scene pf business; that, nevertheless, whenever built or resided thereon, but purchased at another place, and all parties considered the agreement for the 2 3-4 acres at an end, and, therefore Nicolson never had them surveyed and laid off, nor paid or offered to pay the plaintiffs any thing for them, nor charged himself with them in the company’s books; but built a house for the company’s negroes on them, the expense of which he charged to the company; and, in an estimate afterwards made by him of his private property, this slip of land was not included; nor does he except them when mentioning in his will that the lands of the company stood in his name: that the whole property had been sold by the executors since the death of Nicolson ; and that they refused to pay to the plaintiffs their proportions of the proceeds of the said 2 3-4 acres.
The plaintiffs therefore prayed to be let into their proportions of the sales, as if the agreement had never existed; that it might be delivered up to be cancelled, as having been vacated and abandoned by all parties; and for general relief, &c.
The written agreement, under the hands and seals of the parties, and bearing date in July, 1792, is in the following words:
‘ ‘Whereas George Nicolson hath notified to us his wish to have part of the land, purchased for the use of the rope-walk company from William Mayo, laid off for the purpose of building a dwelling-house, and that the said land shall be vested in him in fee-simple, We, William Atcheson and John Cringan do agree that the said land be laid off in manner following, viz. Beginning, &c. which shall be valued agreeable to the original cost of the whole, which valuation the said Nicolson *shall pay to the said rope-walk company. ’ ’ This instrument was attested by one witness only.
The defendants in their answers admitted that the land was never laid off, nor valued, nor paid for by Nicolson, nor charged to him in the company’s books; that the dwelling-house mentioned in the agreement was intended for Nicolson’s own residence, and that the purport and object of the agreement was that he should reside therein ; at least (they say) “they have no reason to think otherwise;’’ that he never built such a house thereon, nor ever resided there, but afterwards purchased a house convenient to the rope-walk, in which house he resided till he went to Madeira in 1802, whence he never returned; that, after the said purchase, he built the brick house mentioned in the bill, as a lodging house for the slaves employed at the rope-walk, the expense of which he charged in the books of the company to the general account of improvements; — that he made an estimate of his property in which the lot of 2 3-4 acres is not particularized, though he might or might not have intended to comprehend it under the item of “land and wharves at Rocket’s;” that there is, also, a clause in his will, dated March 12th, 1802, wherein he says, “the legal estate in the lands and tenements belonging to the rope-walk concern is only in me, although the before named John Cringan and William Atcheson are each entitled to one fifth part.” They likewise admitted that, after their testator’s death, viz. in 1803, the complainants and defendants caused the rope-walk tenement, including the lot in dispute, to be divided into twenty-two lots, and sold the same at public auction, on credit, in order to enhance the value; and that the lot in question, including the house, sold for about 1,3001. or 1,0701. exclusive of the cost of that house; the original cost of the lot, in proportion to the whole, being about 271. 10s. only.
After admitting these facts, they declare that they have no knowledge that their testator ever consented to vacate and annul the agreement; and that neither of them ever saw it until after his death. Andrew Nicolson, one of the executors, states that he was informed of it by him in his lifetime; and that he believed that, after the purchase of the house near the rope-walk, the agreement was considered as vacated; but he had no foundation for his belief from any thing he ever heard his testator say on the subject. Thomas Nicolson, the other executor, says he knows nothing of his testator’s ever having consented to vacate the agreement: on the contrary, he has reason *to believe it never was vacated, because he remembers his testator, when about to remove to the house he had purchased, asked him to walk with him to view that part of the rope-walk tenement which he had purchased to build on ; and that, a few days before his departure for Madeira, he heard him direct his clerk, Richardson Taylor, to set up posts or stones as marks at each corner of the ground.
The deposition of Richardson Taylor agrees with the last mentioned allegation, and states that Nicolson, the decedent, gave him a memorandum of the bounds, in writing, which he mislaid, and therefore did not perform his directions; but that he well recollects their corresponding precisely with the written agreement; that Nicolson told him that that part of the ground was his private property, and that he wished the boundary lines fixed, so as to shew what part belonged exclusively to himself ; that Nicolson had repeatedly informed him of the same thing; that, in the year 1801, part of it was sown in clover at his expense; and that he is well convinced, from their frequent conversations, that Nicolson did claim and consider that part of the rope-walk tenement as his own.
Call, for the appellants. The agreement was founded on the condition of Nicolson’s residing on the land, which he failed to do. A condition is binding in equity, though not expressed in the writing; it being a fraud on the contracting parties not to perform the condition intended: the doctrine *195 is laid down in Co. Litt. that a woman enfeoffs a man with a view to a future marriage, and it never takes place, the feoffment is void. But here, one of the expressions in the written articles is, “for the purpose of building a dwelling-house.” This shews, with sufficient clearness, that such a condition was in fact annexed to the contract. It is also established by the admissions in the answers; the bill charging that the only object was to accommodate Nicolson with a residence convenient to the rope-walk, in order that he might pay the more attention to the company’s business; and the answers not denying this to be true.
Yet he never built the house, and never went to live on the land: — the contract was, therefore, vacated and abandoned.
That such was Nicolson’s own idea is proved from all the circumstances of the case.
*1. Though the contract was in 1792, no survey of the 2 3-4 acres was ever made. It may be objected that he had the legal estate in the whole land: — but the boundaries of his equitable estate in the 2 3-4 acres ought, nevertheless, to have been ascertained. 2. He never paid any thing for it; never charged himself with it, either in the company’s books or his own ; but gave a mere ex parte direction to one of his clerks to go and set up posts, as the bounds of the 2 3-4 acres, which he had no right to do. 3. The agreement was never recorded. 4. Long after this pretended purchase, .Nic-olson builds a tenement to accommodate the labourers in the rope-walk, and builds it on these 2 3-4 acres. This proves that he considered that lot as the property of the company, since he built a house belonging to the company upon it. It the land had been his, the company’s house must have been taken down, at the expiration of the partnership, and removed. S. A week or two before Nicolson left this country, he takes an estimate of his property, and does not include this land. It may be said it was comprehended under the words ! ‘lands and •wharves at' Rocket’s;” but this cannot be; for he rates the value of the lands and wharves at Rocket’s at 1,0001. ; yet this lot, exclusive of the wharves, sold for 1,0001. and more. 6. There is something particular in the language of his last will and testament. He says, '“The legal estate in the lands, &c. is only in me,” &c. When a man was piously bent upon giving others their rights, as he appears to have been when this clause was written, it is inconceivable that he would not have also done himself justice, and made the exception in his own favour, if he had considered the 2 3-4 acres as his property.
The 'answer of Andrew Nicolson is important. In his testator’s life-time he conceived the written agreement vacated.
As to Richardson Taylor’s deposition; Lady Lanesborough’s case(a) proves that, where there was a covenant to renew a lease at the end of twenty-one years, and, from circumstances, the contract appeared to have been mutually abandoned, expressions of the covenantor were not allowed to be set up for the purpose of reviving it. So, here, it would be monstrous that the ex parte directions of Nicolson should be set up as evidence of his title.
His conduct had previously been, per se, an abandonment of the contract. Though no particular time was mentioned for performance, some reasonable period ought to be fixed within which it should have been’‘'fulfilled, (b) Here Nicolson suf-ferred ten years to elapse. But the reason for dismissing the bill, in the case cited from Brown’s Pari. Cases, was understood to be that from the year 1714 to 1722 was too long a time after which to demand execution of the agreement.
Copeland, for the appellees. Mr. Call’s whole argument is founded on supposing the consideration of the agreement to be, that Nicolson was to built a house and reside in it. But there is no such stipulation in the agreement. Nicolson only notified that he wanted that land for that purpose. Suppose he had mentioned in the contract with Mayo that he bought the land for a rope-walk, and yet had never built a rope-walk; would this have set the contract aside?
The case of a woman making a feoffment in consideration of marriage has been mentioned. In that case there must have been proof of the contract of marriage, and that the feoffment arose from it: but here there is no proof that the stipulation pretended to be the foundation of the agreement actually existed.
It is said that Nicolson never paid the money. Why did they not compel him to pay it? — That he never entered it on his books. This was a mere omission, and proves nothing. That he never had the 2 3-4 acres surveyed. Was it more the duty of Nicolson, than of the other partners, to have made the survey? The lines, in this case, were so plainly described there was very little necessity for a survey.
But the agreement was not recorded ! It would have been an absurdity to record it; because Nicolson had a legal estate in the whole land, and their equitable estate in the 2 3-4 acres was relinquished by the agreement under seal.
This lot of ground, however, was not included in Nicolson’s estimate of his property ! If a man, in making an estimate of his property, omits a part, though the deeds are in his desk, does this omission affect his title?
It is urged too, that he estimated all his property at Rocket’s at 1,0001. only. The smallness of this estimate is not to be wondered at; there having been a prodigious rise in the value of property about Richmond since that time.
A particular expression in his last will is also relied on. But it is evident he was there speaking only of the company’s property at the time of making the will, not at all of *the 2 3-4 acres which had been his own separate property for ten years before. One of the executors, in his answer, says, that he frequently spoke of the property as his own; and Richardson Taylor’s deposition is to the same purport.
Warden, for the appellants, in reply, urged the great advantages which would *196 have arisen to the partnership from Nicol-son’s residing1 on the land near the rope-walk, and being thereby enabled the better to attend to the business; and contended, therefore, that the words of the agreement ought to be understood as binding him to build a house and reside in it himself for that purpose. The value of property in Richmond had greatly increased: the erection of the rope-walk had considerably enhanced the value of the whole 16 acres. Yet he was to have the 2 3-4 acres at the original price. This shews that they must have had in view his building a house and residing in it; in consideration of which they consented to make so great a sacrifice.
A strong circumstance to prove that Nicolson abandoned the contract and considered it as vacated, was his having built a house, for the use of the company’s negroes on the 2 3-4 acres, and charge them with the price of the building. This evinces that the house was regarded by him as belonging to the company; and, if the house was theirs, the land on which it stood was theirs also.
Mr. Copeland asks why did not Cringan and Atcheson compel Nicolson to pay the money? — The answer is plain. Because they saw he had abandoned the contract. He says too, there was no need of a survey, the boundaries being- sufficiently plain. But those boundaries might have contained more than 2 3-4 acres of land; it was necessary, therefore, to run the lines, in the directions called for, so as to contain no more. Since Cringan was a professional man, Atcheson lived at Norfolk, and Nicol-son was the superintendant of all the business of the company, he ought to have had the survey made, if the bargain had not been abandoned.
With respect to the expression in the will —after the marks of abandonment which appear in the case, the Court should consider him as speaking of the whole 16 acres ; and, as to his estimate of his property1 — it ought to be understood that he was valuing only the property which he held severally, without any other person’s having a share. According to this interpretation of the will and of the estimate, both will be rational and sensible.
*Call, on the same side, cited 10 Co. Rep. 42, to shew that at law an executory contract will be avoided by nonperformance, although the legal estate is conveyed; and the argument is a fortiori where no conveyance has passed.
The contract here was clearly conditional;(a) and was vacated by the delay to complete it. (b)
Copeland observed that the contract was completed when the writing was signed; the legal estate in the whole being in Nic-olson, and no farther writings being necessary ; that, if he had died the next day,- the contract would have been in force; and that there was no intimation, in his life-time, on the part of Cringan and Atcheson, that they considered the contract not in force. Why did they not sue for the money for which they sold the lot of 2 3-4 acres to Nicolson, instead of bringing this suit for the sum for which it was sold since his death? The great rise in the value of property here is the true cause of this suit. If, instead of 251. the 16 acres had originally cost 7001. they would perhaps have sued him in his life-time on the contract, and this suit would never have been brought.
Where is the evidence that Nicolson agreed to build a dwelling-house? The executors only conjecture it. As to his building a house upon the land for the company;, the cost of that house was only charged in the general account of improvements. There was no difference between his doing this, and his taking the company’s money and paying for it. His failing to correct it by a county entry is no proof that he did not intend to do it afterwards.
Friday, October 16. The Judges delivered, their opinions.
JUDGE TUCKER,
after stating the case, in substance as it has been stated by us, said: The object of this suit is to set aside and annul an agreement, in writing, and under seal of all the parties, (in obtaining which no fraud or circumvention is suggested.! on the ground of its being abandoned and vacated by the general consent and agreement of all the parties thereto. The proofs on which they rely are the several circumstances before mentioned.
That circumstances may amount to conclusive evidence of a general abandonment of an agreement by all the parties thereto-is proved by Eady Eanesborough’s case, (c) relied on by Mr. Call, and cited by Powell on Contracts, 413, 414.
In that case the lord and tenants of a manor entered into an agreement for inclosing a part of a common; to ^effectuate which, the lord by a separate instrument had released each particular tenant from all quit-rents and services; and the tenants, by another, consented to the inclosure, and released their right of common. The inclosure was begun; but, upon some of the hedges being privately thrown down, and other obstructions happening, the lord relinquished his design, and the tenants continued to enjoy their right of common and to pay their quit-rents, and to do suit and service in the same manner as if no such agreement had ever been made; but the instruments, which had been executed were neglected to be cancelled. A question afterwards arose, between the alienee of the lord, and a representative of one of the tenants, who had paid quit-rent, &c. and enjoyed the common for five and twenty years after the agreement entered into, whether these subsequent transactions did not amount to a waiver of the agreement; and it was held they did.
In this case the circumstances were extremely' strong, and the conduct of the parties, on both sides, such as amounted to conclusive evidence of a mutual intention to abandon the agreement. The lord desisted from his undertaking to inclose the common which he had actually begun; the tenants continued to enjoy their right of common which had never been interrupted; and they not only did suit and service at the *197 Eord’s Court, but paid their quit-rents, as if no such agreement had ever been made; and this state of things continued for five and twenty years; after which it was held that the tenant could not be permitted to plead this dormant agreement in bar of an avowry made upon a distress for arrears of quit-rents. The case before us appears to me to fall very far short of this. There is not a single act, word, or circumstance proved on the part of the complainants, or even suggested in their bill, to shew that they ever considered the agreement as abandoned, or that they wished or meant to abandon it, so long as Nicolson lived, nor, in fact, until after the sale of the property bjT his executors. Nicolson, it is true, was guilty of some acts of neglect. He never had the ground laid off; but no time was limited for doing this; nor is there any thing in the contract to shew that it was incumbent on him to do it, more than it was upon the plaintiffs. He never paid the money; nor was it ever demanded of .him: he purchased another house near the rope-walk, and resided therein, and never built upon the lot: but, although the motive to the purchase seems to have been to build a dwelling-house, there is no condi - tion *that he shall build, and much less, that he was to reside thereon. He might have sold the lot the next moment ; for he was to have it in fee-simple: he did not have the agreement recorded ; but the law did not require it, even if it had been a conveyance, except as a protection against creditors and subsequent purchasers. He built a house upon the lot; but this might have been through mistake of the boundary lines, which were never actually extended until after his death. He charged the expense of this house to the general account of improvements in the company’s books. This might have proceeded from the same mistake; or, if the house was intended for his own benefit, the error in charging it to the general account of improvements .might have been corrected by a single entry: or the error might have been from the mistake or neglect of his clerk. There is not one of these circumstances, however strong, which might not have received, and which do not admit of satisfactory explanation, had he been called upon by the plaintiffs in his life-time, or had they during that period done any thing on their parts to manifest a desire of rescinding the contract. This is very different from the doing suit and service and paying quit-rents by a tenant, as well as enjoying the right •of common by a tenant, for five and twenty y-ears. None of these acts, nor their object could be mistaken ; nor could they be founded in mistake.
Before I proceed to consider the evidence farther, I shall mention one or two other •cases, which have been decided in the High Court of Chancery in England on the ground of abandonment. The first is that of a covenant in a mortgage, that, if the «state was to be sold, the mortgagee should have the preference. And after the death of the mortgagor, his heir (knowing nothing of the contract, the counterpart of the mortgage having been delivered to the at-tornies of the mortgagee, who refused giving any copy), entered into an agreement for the sale with a person who also knew nothing of it; and the mortgagee’s attorney insisted on payment of the money due, on the ground that the security was insufficient for the principal and interest, but never mentioned the mortgagee’s right of preemption, until after the estate was sold. And it was held that he could not claim to the prejudice of the purchaser, or of the heir, after having so long a time in which he might have done it before the estate was sold.(a)
*This is nothing more than the common case of a purchaser without notice not being affected by a latent in-cumbrance, or covenant that is wilfully withheld from him, as in that case. And, here, it is to be remembered the mortgagee was plaintiff, and equity would not aid him.
Again, where a woman by a marriage-contract have an exclusive right to her separate estate, but permits the husband to receive the rents and profits of it, the law will intend that she consented to the husband’s receipt of them.(b) But, in a subsequent case, Eord Hardwicke determined that this intendment of law may be rebutted by parol proof, (c)
Now, in' this case, the evidence of abandonment of this agreement is merely circumstantial. There is not a title of evidence of any intention of the kind on the part of the plaintiffs, until after the sale made by the executors; and the presumption arising from the-circumstances already noticed in Nicolson’s conduct is rebutted by the positive testimony of his brother, Thomas Nicolson, in his answer, and that of his clerk, Richardson Taylor, which is too strong and too pointed to be mistaken, and shews that he never had any such intention ; but, on the contrary, that to the latest period of his life he considered the property as his own; which brings the case within the reason of that of Ridout v. Eewis, 1 Atk. 269, above referred to.
On the ground of abandonment, which implies in this case the mutual consent of both parties to rescind a fair contract deliberately entered into between them, I see no reason for sustaining the complainant’s bill. And as I have never considered a Court of Equity as possessing the right to annul such contracts upon any other ground than the mutual consent of all parties expressly given, or necessarily implied, I think the Chancellor’s decree was so far right. And I think this Court ought to discountenance bills of this nature, the object of which is to annul and cancel a solemn and fair agreement, where ^.11 parties appear to have acquiesced in it without complaint until after the death of one of them. And I hold that there is a very solid and material distinction between bills of this nature and such as are every day brought to compel the performance of an agreement. In the one case, the Court (directing itself to the conscience of the defendant) says, you have *198 solemnly entered into this stipulation or agreement, and we will enforce you to comply with it; in the other, it undertakes to annul and make void *what the consciences of both parties required to be performed, and what one of them is still willing to abide by.
The decree is, however, I conceive, defective in not directing the payment of the purchase-money with interest, and the repayment of the money expended in building the house for the negroes with interest from the time of the sale, or such other period as it ceased to be used for the accommodation of the negroes belonging to the company; considering the use of it as equivalent to the interest to that period. This I conceive to be the full measure of the relief to which the plaintiffs are entitled in this case.
JUDGE ROANE.
This is a bill brought by the appellants, praying that the agreement of the 19th of July, 1792, may be decreed to be delivered up to be cancelled, and that the appellees may be decreed to pay, to each of the appellants one-fifth part of the proceeds of the sales of the lands embraced by the said agreement. It praj's that the said agreement, (which relinquishes the equitable title of the appellants to the land in question,) may be considered as no longer binding on them, on the ground that a condition of building and residing on the premises, was understood to be a part of that agreement, which condition has not been performed; but, on the contrary, they contend that the testator of the appellees made his election to waive and abandon his rights under the same.
The appellants consider, and I think justly consider, that, although (notwithstanding this forfeiture and taking no advantage thereof) they might have coerced the appellees’ testator to have paid the money stipulated to be paid by the said agreement, and, probably, also have coerced the building and residence on the land, within a reasonable time according to their construction of the agreement, (a) if, as to this, they were not barred by the act of Frauds, as applying to the original written agreement; yet that, on the other hand, they may waive 'the assertion of this right, and joining issue with the appel-lees in respect of their testator’s abandonment of the agreement, consider it as wholly at an end, and subject to be delivered up to be cancelled. On this latter ground they have elected to proceed.
This agreement is to be considered, 1st. As upon its own face, independently of ether proof or circumstances; and, 2d. As affected by such proof or circumstances.
*In the first point of view, I cannot entirely persuade myself that a condition of building and residing on the premises, is sufficiently stated in the agreement. Although probably, (for there is no proof on this subject,) considerable improvements may have been made on the rope-walk premises, since the purchase from Mayo; and before the date of this agreement, thereby enhancing the value of every part of the 16 acres; (to say nothing of the progressive increase of the value of property in and near the city of Richmond;) when we find that the 2 3-4 acres now in question were to be appropriated to the ap-pellees’ testator, at the same price per acre that the whole originally cost, it is naturally to be presumed that there was some other consideration or motive operating with the appellants in entering into the agreement in question. This consideration was, no doubt, the one stated by the appellants, and not denied, (if not admitted,) on the part of the appellees; a consideration which would have been really valuable to the whole rope-waIk copartnery. The existence of this motive also gains great colour from the actual phraseology of the agreement in this particular, which is pretty strong, I admit, to import a condition. But, as it is possible, nevertheless, that the prospect of the building and residing upon the premises by Nicolson may not have been any part of the inducement to the grant, as men must be permitted to sell their property for even less than it cost them and to make bad bargains; and as, admitting this circumstance to have been in truth a part of the consideration expected and agreed upon, between the parties, it may have been the folly of the appellants to have trusted tee the declaration of the intentions of the ap-pellees’ testator, rather than to have exacted from him a written condition to build and reside upon the premises; we cannot enlarge the representation of his intention stated in the agreement, (as considered merely upon the agreement itself,) into an actual condition or stipulation to that effect,
Thus stands the case upon the written agreement singly considered.
The case is, secondly, to be considered in relation to other proofs and circumstances.
Some stress has been laid upon the circumstance that this agreement is contained in a solemn and sealed instrument. For my part, I throw the seal entirely out of the question, and only consider it as a written agreement comprehending the terms of the contract between the parties, and such as is required under the statute of frauds, in '^relation to a sale of land. The policy of that act, in relation to certainty and the avoiding of perjuries, is as much answered by a written as by a sealed instrument. In considering this instrument,' therefore, merely as an agreement under that statute, I shall not differ it from a memorandum or agreement merely in writing. If it were necessary to quote authorities on this point, Powell on Contracts, 436, &c. states many instances in which the most solemn and sealed agreements were considered as altered and waived by acts other than the execution of instruments deemed of equal dignity with them; the spirit of equity, especially as applying to the construction of the statute of Frauds, exploding the maxim 1 ‘dissolvitur eodem, ligamine quo ligatur. ”
It is contended by the appellants that the condition of building and residing on the premises'was a part of the contract between the parties, although it may not have been explicitly stipulated in the writing. Such *199 an addition to the contract, it resting entirely upon parol proof, the policy of the law, in relation to the danger of perjuries, would not permit to be established. If, for example, 20 men were to swear that they Well recollect such a condition to have been agreed upon by the parties at the time of executing the writing, their testimony would not avail under the statute: — but, if the appellees’ testator has himself stated this in writing; or, if he has done acts entirely incompatible with any other idea, the established principles of construction of the act of frauds allow us to take such admissions and acts into account, in forming a conclusion.
In the case before us, it is stated in the bill, and echoed, totidem verbis, in the answer, that the whole 16 acres were purchased “for the purpose of establishing a rope-walk thereon, and houses for the accommodation of labourers employed in that business.” It is also admitted in the answer, that “after the appellees’ testator purchased a seat for his own residence, near the rope-walk, he built, upon the spot of ground mentioned in the said written agreement, a brick house, as a lodging house for the slaves employed at the rope-walk, the expense of building which he charged on the books of the said rope-walk company to the general account of improvements. ”
Taking these two admissions together, can there be any doubt but that it was either originally, or at least subsequently agreed by the appellees’ testator, and that in writing, (I here refer to the entry in the company’s books,) that the land, on which the company (through him and bjr 'x'him) .built a house with their own money, and for one of the very purposes for which the land was originally purchased, ceased to be his land, and was solemnly admitted by him to be the land of the company. If, at this time, a part of the rope-walk works themselves had been extended into this ground, could he afterwards have pretended a private property therein? —Yet the building a house for the accommodation of the negroes of the concern comes as much within the end and purpose of the original purchase, as before admitted, and is as much a badge of partnership property as the erection of the very works themselves thereupon would have been: the works themselves could not have been prosperously carried on without such necessary appendages: every argument, therefore, which would be drawn from the erection of the rope-walk houses themselves, equally applies to the houses in question. If, at this time, the testator of the appel-lees had abandoned in writing, by a new agreement written on a transitory piece of paper, his claim to the premises, would it have been more certain or explicit? would it more clearly have related to the original agreement, arid precluded the danger of perjuries depending upon parol proofs, than this permanent writing contained in the books of the company, and this coeval and concurrent act of building a house with the company’s money, and for their negroes upon the very land in question? — As it is not usual to waive and abandon an absolute purchase of lands, shall not this act of waiver be referred to an agreement containing a condition which has not been complied with? Shall it not be referred to and be construed as explanatory of the agreement of July, 1792, as contended for on the part of the appellants? And, even throwing the idea of a relation to the original agreement out of the question, does not this case come strongly within the reason of the principle which declares that, if land be purchased in the name of A. and paid for with the money of B., A. is considered to hold in trust for B., or, in other words, the land is considered as belonging to B.?
If the appellees’ testator were now alive, and had confessed either that the condition in question had originally been agreed upon between the parties, and had not been complied with, or that he had subsequently abandoned and waived an agreement which in itself had no condition, (however improbable this last maybe,) it is certain that this confession, even under the act of frauds, would have entirely availed the appellants, and superseded the necessity *of producing a written agreement ; and, considering the existence of the above entry in the books, and erection of the house for the negroes, it is impossible but that he must have confessed it, if he had been alive: — he could not justly have contended that the property (which he had admitted to belong to others, by the most explicit and unequivocal acts,) still remained his own.
Riven considering the entry in the books of the company as entirely a distinct and after-transaction, it was certainly as competent for the appellees’ testator thus to re-transfer the estate to the appellants, as for the appellants to have originally conveyed it to him by the agreement in question. I have already said that I consider the agreement of July 1792, as merely a contract reduced to writing: and, with respect to the entry in the books of the company, it is well known that a letter, memorandum, or any irregular writing is sufficient under the act of frauds, provided it be signed by the party, and the terms of the agreement be distinctly stated. I will not here stop to inquire whether that entry (standing singly, and considered as an after and distinct agreement,) would be held as a sufficient writing under the statute: — but this I say, that, taken in connex-ion with the erection of the house for the house of the company, it amounts to irresistible proof of an abándonment of the agreement, if unconditional, or, if conditional, that that condition has not been complied with.
If, in the case before us, the testator of the appellees had written a quire on this subject, on transitory sheets of paper, he could not more clearly have evinced his agreement to yield or transfer the land to the company, than by the entry in question, followed up by the erection of the building for the company’s negroes, and paid for with the company’s money. This entry and erection completely estop the ap-pellees from saying that the condition of building and residing was not a part of the original agreement, although not therein *200 inserted, or, at least, estop them from denying a waiver of the land on their part; it prevents the necessity on the pare of the appellants of resorting to parol testimony; it consequently shuts out the danger of perjury which the act of frauds was meant to prevent; — and this case comes fully within the reason of those cases in which the parol agreement is confessed in the defendant’s answer, or confessed by his carrying the agreement into execution on his part: after these unequivocal acts, it does not lie in the mouth of the appellees to call for proof from the appellants to support their construction of the “'agreement. Delivering possession of land is always deemed an execution of an agreement, so as to dispense with writing under the statute; (1 Ronb. 180, Phila. ed.) and in this case I consider the acts in question equivalent to a delivery of possession of the premises to the company. This case is infinitely stronger than the case of Only v. Walker, (a) where the defendant having denied the agreement in his answer, evidence was admitted to shew that he had confessed the agreement at a prior time, which being supported by the testimony of one witness prevailed. Our case is stronger, not only because the condition contended for is not denied by the answer, but also because the acts done by the appellees’ testator, ut supra, are much more conclusive against him than a mere verbal confession.
As to the abandonment evinced by those acts, it is powerfully supported by several of the other circumstances stated in the bill. These, singly, might not be sufficient, or might be susceptible of plausible answers, but coming in aid of this principal circumstance entirely turn the scale.
This evidence of abandonment is not confronted by any conflicting testimony. The answer of Thomas Nicolson stating his brother’s conversation respecting this land “when he was about to remove to the seat he had purchased,” if it is not balanced by the answer of the other appellee, does not necessarily relate to a point of time posterior to the entry and erection aforesaid, (the dates of which are not shewn,) and therefore may be considered as applying to a period anterior to his conclusive waiver of the agreement.
As to the testimony of Richardson Taylor, it is not only, perhaps, in conflict with some of the circumstances in this case, (such as .the inventory of his estate made by the testator, &c.) but applies to a point of time long after the testator had concluded himself as aforesaid: — he was not then at liberty to resume the property which he had long before given up and abandoned.
But it is said that Nicolson might not have known that the house admitted to have been built for the company’s negroes was located on his land, and that there is no conclusive proof that the money was paid by or charged to the company.
I will premise that the latter part of the first objection is in conflict with the second the admission that the house was built for the company’s negroes is in itself pretty “strong evidence that it was built with the company’s money:— but, besides, a charge for the expense of building it is contained in the books of the company “to the general account of improvements:” what improvements? improvements on the company’s premises, and for the company’s account. As to any mistake on the part of Nicholson, in respect to the spot on which this house was erected, none such is pretended, or can be conceived. The defendants explicitly admit that the house was built ‘ ‘upon the spot of ground mentioned in the written agreement.” An inspection of the boundaries, stated in the agreement, will shew that it is highly improbable that any mistake in this respect could possibly have existed; besides, the appellees’ testator well knew the boundaries, not only as existing upon the paper, but as marked out upon the soil; he shewed this ground to his brother Thomas, some 3rears before his death, and he gave a memorandum of the boundaries to his clerk, wishing him to set up corner-stones on the premises, a little before his death, without, in either case, stating any uncertainty as to the lines. Admitting, therefore, that it was the business of this Court to make the appellees’ case better for them than they themselves have chosen to make it, it would require a great degree of astuteness in us to shew that any mistake in locating the house in question could possibly have existed.
With respect to this house, I will remark that the appellees’ testator has not only neglected to charge himself on the nooks of the company, with the expense of building it, but has omitted to charge the company with the rent thereof either on the books of the company, or his own private books; an omission which militates very strongly against the ground of private property now set up by the appellees.
As to the case of Danesborough v. Ocks-hott, it is much stronger than the case before us, and yet a waiver was held to have taken place. In that case there were solemn and unconditional agreements on both sides, and yet circumstances were permitted to shew that the agreements were waived. There is nothing in the case, (as appears from the accounts I have seen of it,) which shews that any great stress was laid upon the length of time in which it had seemed to be acquiesced in. In that case there was the enjoyment of the right of common on one hand, and the receipt of quit-rents on the other: in this case “there is a complete abandonment of the land by the appellees’ testator, and enjoyment of it by the appellants.
But it is said bj' the Judge who preceded me that no act was done by the appellants notifying their acceding to the waiver. The answer is, first, that this act of their agent absolved them from the necessity of it, if it had been limited, as to them, in point of time; and, 2d. That no such limitation exists in this case. They were at liberty to join issue as to the waiver, at the time of bringing their bill, which they have done.
He has also said that the circumstances in this case are rebutted by the testimony of Thomas Nicolson, supported by that of Richardson Taylor.
*201 I have already said that the former relates to a point of time antecedent to the actual abandonment by Nicolson, and that the latter refers to a period when Nicolson had estopped himself from resuming the property, which, years before, he had solemnly given up, subject, however, to an acceptance thereof on the part of the appellants.
I have thus considered this strong evidence of abandonment, as it were, in a double aspect — 1st. As referable to and explanatory of the original agreement; and, 2d. As amounting in itself to a substantial and distinct retransfer of the property to the company.
The last is least probable; although, on the ground of an implied trust, these circumstances might be amply sufficient to vest the land in the company. The first is most natural and reasonable; and amounts in my judgment to conclusive proof that the original agreement was, as it is alleged by the appellants to have been: and these circumstances are strong enough to let in the appellants to the benefit of that agreement, the act of frauds notwithstanding.
The result of my reflection upon this case therefore is, that the dismission of the bill was erroneous, and that its prayer ought to be granted.
JUDGE EYONS.
When this cause was first open, I thought it so plain, clear, and simple as scarcely to admit of a doubt, and was surprised at the decree.
The suit is said to be brought to set aside a sealed contract fairly entered into without fraud or circumvention. But I view it in a different light. I consider it as a suit for specific performance of an agreement and for execution of a trust; since Nicolson was agent, factor, and trustee of the company, and, instead of building a dwelling-house *for himself on the 2 3-4 acres, and paying for them, (as he
should have done if he had meant to appropriate them to himself,) improved them for the company, and with the money of the company, and therefore had no exclusive right to them, according to the plain intent and meaning of the agreement. He only notified a wish to have part of the 16 acres laid off for the purpose of building a dwelling-house. What did Atcheson and Crihgan say? We do agree that the land be laid off in the following manner. For what use and purpose? That is not expressed; but surely the words “for that purpose, ” or “the purpose aforesaid,” were necessariy implied according to every rule for the construction of deeds.
JUDGE WIEEES
has collected and laid down plainly and clearly the rules for construing deeds, in the case of Parkhurst v. Smith, (a) These rules are — 1. “That the construction ought to be favourable, and as near to the apparent intent of the parties as possibly may be and the law will permit; — 2. That too much regard is not to be had to the natural and proper signification of words and sentences, to prevent the simple intention of the parties from taking effect; for the law is not nice in grants, and therefore doth often transpose words contrary to their order, to bring them to the intent of the parties; — 3. That, when the words of a deed are doubtful, the first thing to be inquired into is the intention of the parties; — 4. That, if the intent be plain and clear, such construction ought, if possible, to be put on the doubtful words as will best answer the intention ; and that which manifestly tends to overturn and destroy it ought to be rejected ; — 5. That, where the intent is plain and manifest, and the words doubtful and obscure, it is the duty of a Judge to be astute in endeavouring to find out such a meaning as will best answer the intent of the parties ;(1) — 6. That, where there are two clauses in a deed repugnant to each other, the first shall be received and the latter rejected.”
These rules are plain and rational, but are now attempted to be controverted; which is not at all surprising, since., unfortunately for mankind, even the fundamental rules of morality have, at times, become the subject of doubt and discussion by the learned and ingenious; which shews, as Willes observed, what the writ of lawyers can do when employed in making objections.
x'Let us apply these rules to the sealed instrument now in question ; and we shall find the intention of the parties, on which the contract was founded, apparent from its own words. Why did Nicolson express his wish in the articles, if that wish was not to be regarded and considered as the inducement? If it was the inducement, it was part of the condition of the contract, and the rules of construction will consider it as such. That he was bound to build the house is an easy and necessary implication, and as binding as if expressed. The language conveying this implication is contained in the first clause, and nothing repugnant to it is found in the subsequent clauses: but, if there were, such repugnant part should be rejected.
He never built; he never surveyed; he never paid.
But it is said that the partner should have sued and compelled payment. Whose duty was it to do it? Was it not his, as agent, factor, and trustee for the company who confided in him that he would attend to the interest of the company, and do what was just, right, and proper on his part? Suppose any other person had been the purchaser; would it not have been his duty to have compelled payment, and not to have suffered money, which migiit have been employed in their trade and business to great advantage, lo lie dead for ten years, without ever receiving even interest? The partners, confiding in him, may not even have inspected the books; and, seeing him build a house on the land for the use of the company, had good reason to believe that he had abandoned his project of building on it for himself.
But he sowed clover] So do many in this town on the lots of other people; and, I suppose, Mr. Nicolson, as agent for the *202 company, might have sowed clover on any part of the 16 acres that could be spared for that purpose; but surely that would not give him an exclusive right to the soil, and a fee simple in the land.
The agreement was never executed on .the part of Mr. Nicolson, whose business and duty it was to execute it, if he meant to claim any benefit from it. In its own nature, it was merely executory; and his whole conduct proves that he never meant to execute it: the property, therefore, was never changed, but belonged to the company, and having been sold, the appellants have a right to their respective shares of the money; that is, each to one fifth.
It is said that, if the land had fallen in value, they would have made him pay the purchase-money. How could they have done that, when he never built upon it for himself, *but built upon it for their use, and with their money which increased its value? The truth is, that if it had notrisen in value, Nicoison’s heirs would never have claimed it; besides, the very words of the agreement made it optional in him, that it might be laid off by him, and valued, and paid for, if he chose to do so. The company had the use of it; and, having built upon it, could never make a purchaser pay for it.
I have no difficulty in saying the decree is erroneous and ought to be reversed.
The opinion directed to be entered was as follows:
“This Court is of opinion that, as the articles of agreement made and entered into on the 19th July, 1792, by and between the appellants, John Cringan and 'William Atcheson, and George Nicolson, since deceased, as partners in the rope-walk company, mentioned and referred to in the bill and answer filed in this cause, for laying off a part of sixteen acres of land, which had been purchased by the said George Nicolson, as superintendent and agent for the rope-walk company, of William Mayo, for the use of the company, were made at the request of the said Nicolson, to accommodate him, for the purpose of building a dwelling-house; and as the said Nicolson lived ten years after the date of the said agreement, and did not survey or lay off the part of the said land he wished to have for the purpose aforesaid, or build a dwelling-house thereon, or pay the value thereof according to the said agreement; but, instead thereof, did build a house thereon for the use of the company, at the cost and charges of the company ; he thereby relinquished and abandoned all right to the part of the said land he wished to have laid off for his use under the said agreement, supposed to be about 2 3-4 acres ; and the said land having been, since the death of the said George Nicolson, sold by the appellees, as his executors, they ought to account with the appellants for the amount of the sales, and pay to each of them one-fifth part of the money arising from the said sale, with interest from the time the said purchase-money became due.”
Decree reversed, and cause remitted for farther proceedings according to this opinion.

 3 Bro. Pari. Cases, 116.

 Johnston v. Buffington, 2 Wash. 116.

a) Plowden. 142, 3; Dyer, 70, pi. 46.

b) 6 Vin. 534, 538; 4 Ves. jun. 667; Spurrier v. Hancock, 5 Ves. iun. 737; Omrod v. Hardman, 1 Ponb. 384.

 2 Brown’s Pari. Cas. 116.

 9 Mod. 2, 3, Orby v. Trigg, cited in 1 Pot. on Cont. 421.

Cb) 2 P. Wms. 32; Powell v. Hankey et al. cited 1 Pow. on Cont. 421.

 1 Atk. 269, Ridont v. Lewis.

 See lFonb. 161, note.

 3 Aft. 407.

 WUles' Ltep. 332 — 884.

CO See also Hobart 277, in the Earl of Olanrick-ard’s case.